# LUNDY, LUNDY, SOILEAU & SOUTH, L.L.P.

ATTORNEYS AT LAW

Hunter W. Lundy
Attorney at Law
hlundy@lundylawllp.com

501 BROAD STREET
P.O. BOX 3010
LAKE CHARLES, LA 70602

www.lundylawllp.com

Telephone: (337) 439-0707
Facsimile: (337) 439-1029

April 28, 2016

**VIA CERTIFIED MAIL**
**7014 0150 0001 8036 8118**
**RETURN RECEIPT REQUESTED**

Joint Glyphosate Task Force, LLC
Through its Registered Agent,
Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

**Re: James M. Work**
**vs. No. 2016-001178; Division "B"**
**Ragan and Massey, Inc.; Monsanto Company; and Joint Glyphosate Task Force, LLC**
**21st Judicial District Court, Parish of Tangipahoa, State of Louisiana**

To Whom it May Concern:

Enclosed please find a Citation and a Petition being served via the Louisiana Long Arm Statute in the above referenced matter.

Joint Glyphosate Task Force, LLC is required to respond to this Petition within the time allowed by law.

With kindest personal regards, we remain

Sincerely,

LUNDY, LUNDY, SOILEAU & SOUTH, LLP

By: ______________________
HUNTER W. LUNDY

HWL/cp
Enclosure
cc: Co-Counsel of Record (via email)

EXHIBIT A

*CITATION – LONG ARM*

*JAMES M WORK*

*Versus*

*RAGAN AND MASSEY INC, ET AL*

***Case: 2016-0001178***
***Division: B***
***21st Judicial District Court***
***Parish of Tangipahoa***
***State of Louisiana***

HHM

*To: JOINT GLYOHOSATE TASK FORCE LLC*
*THROUGH ITS AGENT: CORP SERVICE CO*
*2711 CENTERVILLE RD STE. 400*
*WILIMGTON, DE 19808*

***THROUGH LOUISIANA LONG ARM STATUTE***

*Parish of*

***YOU ARE HEREBY SUMMONED*** *to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing a pleading or otherwise, in the Twenty-first Judicial District Court in and for the Parish of Tangipahoa, State of Louisiana within 30 days after the filing in the record of the affidavit of the individual attesting to the manner of delivery made through the "Long Arm Statute" hereof, under penalty of default.*

*This service was ordered by attorney HUNTER W LUNDY and was issued by the Clerk of Court on April 25, 2016.*

*Pleading Served*

*PETITION FOR DAMAGES*

[signature]
*Deputy Clerk of Court for*
*Julian E. Dufreche, Clerk of Court*

***Service Information***

*Received on the _______ day of __________________, 20_____ and on the _________ day of __________________, 20____ served the above named party as follows:*

***Personal Service*** *on the party herein named ______________________________.*

***Domiciliary Service*** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of ______________________________, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

***DUE & DILIGENT UNABLE TO SERVE BECAUSE:*** ______________________________.

*Returned:*
*Parish of ______________________________ this ________ day of __________________, 20_____.*

*Service $__________*

*Mileage $__________*

*Total $__________*

*By: ______________________________*
*Deputy Sheriff*

[ ORIGINAL ]

*CITATION – LONG ARM*

*JAMES M WORK*

*Versus*

*RAGAN AND MASSEY INC, ET AL*

*Case: 2016-0001178*
*Division: B*
*21st Judicial District Court*
*Parish of Tangipahoa*
*State of Louisiana*

HHM

To: *JOINT GLYOHOSATE TASK FORCE LLC*
*THROUGH ITS AGENT: CORP SERVICE CO*
*2711 CENTERVILLE RD STE. 400*
*WILIMGTON , DE 19808*

***THROUGH LOUISIANA LONG ARM STATUTE***

*Parish of*

***YOU ARE HEREBY SUMMONED*** *to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing a pleading or otherwise, in the Twenty-first Judicial District Court in and for the Parish of Tangipahoa, State of Louisiana within 30 days after the filing in the record of the affidavit of the individual attesting to the manner of delivery made through the "Long Arm Statute" hereof, under penalty of default.*

*This service was ordered by attorney HUNTER W LUNDY and was issued by the Clerk of Court on April 25, 2016.*

*Pleading Served*

*PETITION FOR DAMAGES*

s/HEATHER MUSE
*Deputy Clerk of Court for*
*Julian E. Dufreche, Clerk of Court*

***Service Information***

*Received on the _______ day of __________________, 20_____ and on the _________ day of __________________, 20____ served the above named party as follows:*

***Personal Service*** *on the party herein named ______________________________.*

***Domiciliary Service*** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of ______________________________, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

***DUE & DILIGENT UNABLE TO SERVE BECAUSE:*** ______________________________.

*Returned:*
*Parish of ______________________________ this ________ day of ____________________, 20_____.*

*Service $__________*

*Mileage $__________*

*Total $__________*

*By: ______________________________*
*Deputy Sheriff*

[ SERVICE ]

JAMES M. WORK : 21ST JUDICIAL DISTRICT COURT

v. NO.: 2016-0001178; DIV. "B" : PARISH OF TANGIPAHOA

RAGAN AND MASSEY, INC., MONSANTO COMPANY, JOINT GLYPHOSATE TASK FORCE, LLC : STATE OF LOUISIANA

FILED: APR 22 2016 : s/HEATHER MUSE

DEPUTY CLERK OF COURT

*******************************************************************************

## PETITION FOR DAMAGES

The Petition of JAMES M. WORK ("JAMES WORK"), domiciled in East Baton Rouge Parish, respectfully represents the following:

1.

Made Defendants herein:

A. RAGAN AND MASSEY, INC. ("RAGAN & MASSEY"), a Louisiana corporation, authorized to do and doing business within the State of Louisiana that can be served through its Agent for Service of Process, Thomas A. Ragan, 1011 North General Pershing Street, Hammond, LA 70401.

B. MONSANTO COMPANY ("MONSANTO"), a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, registered and doing buinsness in the State of Louisiana that can be served through its Agent for Service of Process, Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802.

C. JOINT GLYOHOSATE TASK FORCE, LLC ("JGTF"), a Delaware limited liability company not registered but doing buisness in the State of Louisiana which may be served via Louisiana Long Arm Statute, through its Agent for Service of Process, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

## JURISDICTION AND VENUE

2.

At all times relevant hereto, Defendants were in the business of distributing, marketing, labeling, promoting, and/or advertising products containing glyphosate in the State of Louisiana, including but not limited to the Parish of East Baton Rouge and the Parish of Tangipahoa.

2016 APR 22 PM 2:54
DEPUTY CLERK OF COURT
TANGIPAHOA PARISH, LA

3.

At all times relevant hereto, Defendants had offices in Louisiana and/or regularly solicited and transacted business in the State of Louisiana and East Baton Rouge Parish. In addition, the Defendants reasonably expected that their products containing glyphosate would be used or consumed in Louisiana and East Baton Rouge Parish and/or reasonably expected that

their actions would lead to other companies' products being used or consumed in Louisiana and East Baton Rouge Parish.

4.

This is an action for damages which exceed fifty thousand dollars ($50,000).

5.

Plaintiff has timely filed this lawsuit within one year of discovering his cause of action as defined and required by the Louisiana Civil Code.

6.

Venue of this case is proper in Tangipahoa Parish because Ragan & Massey is domiciled and registered in Tangipahoa.[1]

7.

Pursuant to La. C.C.P. 2324 in actions alleging joint and several liability against two or more defendants, venue is proper if it is proper as to any of the defendants. In this case, Plaintiff alleges joint and several liability on more than two defendants. Tangipahoa Parish is the proper venue for one or more of these defendants. Therefore, venue is proper on all defendants.

**INTRODUCTION**

8.

In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds used in 2007.[2] As of 2013, glyphosate was the world's most widely used herbicide.

9.

Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world

[1] LA, C.C.P. Art. 42

[2] Arthur Grube et al., U.S. Environmental Protection Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

seed market.[3] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean, fields in the United States were Roundup Ready®.[4]

10.

Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[5] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[6] It has been found in food,[7] in the urine of agricultural workers,[8] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[9]

11.

Ragan and Massey, Inc. is a corporation actively marketing and distributing glyphosate-based product that, beginning in the mid to late 2000's conspired with Monsanto and at least 24 other companies to perpetrate a fraud on the public and to intentionally misrepresent to the public, including the Plaintiff, that glyphosate was non-cancerous and safe to use. These companies formed the JGTF as part of a conspiracy to market a product they knew to be dangerous to humans and intentionally and fraudulently misrepresented to users, government officials, and the public as to the threat of non-Hodgkin's Lymphoma ("NHL") caused by glyphosate and its formulations.

---

[3] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[4] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. Times, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[5] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[6] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[7] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 Food Chemistry 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[8] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) Environmental Health Perspectives 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 Ithaka Journal 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

12.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

13.

On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

14.

The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

15.

The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

16.

Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, all Defendants have repeatedly proclaimed and continue to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

[10] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

## PARTIES

### PLAINTIFF

17.

Plaintiff James M. Work resides in Baton Rouge, Louisiana. On information and belief, he was exposed to Roundup® and was diagnosed with NHL in November, 2014. Mr. Work first learned that exposure to Roundup® can cause NHL and other serious illnesses in 2016.

### DEFENDANTS

18.

At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®. From 2008 to present Monsanto conspired with the other Defendants to fraudulently market and sell a dangerous product to Louisiana citizens, including Plaintiff.

19.

The JGTF is a limited liability company consisting of at least 25 companies that produce glyphosate-containing products. One of its member companies is a resident of Louisiana: Ragan and Massey, Inc.

20.

From 2010 to present the JGTF conspired with the other Defendants to fraudulently market, sell, and expose a dangerous product to Louisiana citizens, including Plaintiff.

21.

Beginning in the mid to late 2000's and continuing to the present, Ragan and Massey, Inc. conspired with the other Defendants to fraudulently market, sell, and expose a dangerous product to Louisiana citizens, including Plaintiff. Said cabal formalized itself in 2010 with the formation of the JGTF.

## FACTS

22.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

23.

Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

24.

For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe. In the mid to late 2000's, all Defendants joined and conspired with Monsanto to continue this campaign to intentionally and fraudulently mislead the population about Roundup®'s safety.

25.

Currently, all of the Roundup® Roundup® product sold in the United States is manufactured domestically at Monsanto's Luling, Louisiana and Muscatine, Iowa locations.

***The Discovery of Glyphosate and Development of Roundup®***

26.

The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s

under the brand name Roundup®.[11] From the outset, Monsanto marketed Roundup® as a "safe," general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[12]

***Registration of Herbicides under Federal Law***

27.

The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

28.

Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

29.

FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

30.

The EPA, the State of California, the State of Michigan, New York State, the State of Oregon, the State of Texas, and the State of Washington have registered Roundup® for

[11] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.
[12] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

distribution, sale, and manufacture in the United States, California, Michigan, New York, Oregon, Texas, and Washington, respectively.

31.

FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

32.

The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C.§ 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

33.

In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

34.

Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

35.

On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

36.

In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

37.

In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

38.

Three top executives of IBT were convicted of fraud in 1983.

39.

In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner

---

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[14] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

40.

Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

***The Importance of Roundup® to Monsanto's Market Dominance***

41.

The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

42.

In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

43.

Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a

[17] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

44.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."
>
> b. "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."
>
> c. "Roundup biodegrades into naturally occurring elements."
>
> d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."
>
> e. "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."
>
> f. "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."
>
> g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.
>
> h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."
>
> i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

[18] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[19]

45.

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

* * *

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

* * *

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

* * *

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

46.

Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, it still has not done so today.

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

47.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

48.

Defendants have continued since the mid to late 2000's to fraudulently and intentionally misrepresent the safety of Roundup®. Defendants conspired in 2008 to form both the Glyphosate Task Force in Europe and the JGTF in 2010, in the United States for the specific purpose of suppressing or minimizing information regarding the carcinogenic nature of glyphosate; and to lobby European and United States governments to re-authorize the license to sell glyphosate by providing misleading information in order to deceive these governments about the safety of glyphosate. Through these task forces and other means, the Defendants have suppressed studies challenging the safety of glyphosate and have launched media attacks on any study or group, including the IARC, that attempts to publish the truth about the safety of Roundup®. Defendants further have ghostwritten articles and paid scientists to publish favorable articles about glyphosate based on "junk science" in an effort to dilute the scientific literature.

49.

On June 6, 2010, twenty-five glyphosate manufacturers officially formed the JGTF, continuing their civil conspiracy by "generating data" to deceive the government and the public about the safety of glyphosate in order to get the EPA to re-authorize the sale of glyphosate and to convince the public that glyphosate was safe.

50.

These task forces allowed Defendants to pool their resources to more effectively suppress safety information and propagate false data.

51.

Multiple studies have been ghostwritten and/or published by the Monsanto and/or the JGTF through companies such as Intertek and Exponent, Inc. from 2007-present which minimize any safety concerns about the use of glyphosate. Seemingly independent scientists have also been paid by Defendants to publish studies minimizing safety concerns about glyphosate.

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

52.

Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR. Defendants have used this report, which they wrote, to falsely proclaim the safety of glyphosate.

53.

Defendants have used consulting companies such as Intertek and Exponent, Inc. to ghostwrite articles for them which falsely proclaim the safety of glyphosate, and to hire scientists to form committees that falsely proclaim the safety of glyphosate.

54.

Defendants further advertise their products by showing members of the public using its products in shorts and without any safety gear. These advertisements do not contain any warnings about the toxic effects of glyphosate.

55.

As a result of Defendants' actions in suppressing safety information and promoting false safety data, the public, including Plaintiff, were unaware that glyphosate causes cancer.

***Classifications and Assessments of Glyphosate***

56.

The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

57.

The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble.[21] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

58.

One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among the Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

59.

In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

60.

In March 20, 2015, the IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

61.

On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat

[21] World Health Organization, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

62.

The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

63.

Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

64.

Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

65.

The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

66.

The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

67.

The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

68.

In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

69.

The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

70.

The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

71.

The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

72.

The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[23] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

73.

Because of its rigorous scientific method and independence, the IARC is a widely respected organization and its findings are considered authoritative. Organizations such as the American Cancer Society and Federal Judicial Center hold the IARC in high esteem The

[22] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.
[23] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Federal Judicial Center describes the IARC as "well-respected and prestigious" and notes that the IARC's assessment of carcinogenicity is "generally recognized as authoritative." Reference Manual on Scientific Evidence 20, 565 n. 46 (3D ED. 2011). The U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") also relies on the IARC assessments when requiring manufactures to warn of the potential carcinogenicity of chemicals. (29 C.F.R. § 1910.1200(d)(4) (2010). *California Chamber of Commerce v. Brown*, 196 Cal. App. 4th 233, 242, 126 Cal. Rptr. 3d 214, 219 (2011)

74.

California, based on the IARC's finding, have announced its intention to list glyphosate as a chemical known to the State of California to cause cancer. This listing when finalized will require Monsanto to warn Roundup® users that glyphosate is carcinogenic.

75.

Despite the IARC's impeccable reputation, the JGTF immediately issued a press release denouncing the findings of the IARC as false and unreliable. The JGTF further challenge California's decision to warn the public that glyphosate was a carcinogen. Monsanto has now sued California to stop them from warning citizens that glyphosate is a carcinogen. On March 31, 2016, Monsanto's CEO falsely proclaimed to the public that glyphosate is not a carcinogen, despite the IARC's findings to the contrary.

76.

In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup® products are more dangerous and toxic than glyphosate alone.[24] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

77.

In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

78.

The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

[24] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004

[25] Martinez et al 1991

79.

In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

80.

The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[26]

81.

In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

82.

The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

83.

In 2009, Nora Benachour and Gilles-Eric Serallini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

84.

The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

85.

The results of these studies were confirmed in recently published peer-reviewed

[26] Molinari, 2000; Stewart et al., 2003

studies and were at all times available and/or known to Defendants.

86.

Defendant, Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'sadjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

87.

Monsanto failed to appropriately and adequately test Roundup®, Roundup®'sadjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

88.

Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

89.

Despite their knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

90.

The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

91.

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

92.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

93.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[27]

94.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[28]

***Recent Worldwide Bans on Roundup®/Glyphosate***

95.

Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 20, 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[29]

96.

The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[30]

97.

[27] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.
[28] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. Pesticide Reform 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[29] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[30] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[31]

98.

Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[32]

99.

The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[33]

100.

The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[34]

**Plaintiff's Exposure to Roundup®**

101.

Mr. Work was first exposed to Roundup® beginning in 1979 while working for Chem Lawn, a lawn care business operating in Louisiana. Subsequent to this, Plaintiff opened and operated a lawn care business in East Baton Rouge, Louisiana, Pro Lawn Management, a sole proprietorship from 1981 through 2008. During this time period he cared for and sprayed glyphosate containing Roundup® on hundreds of properties. After selling his business Mr. Work has continued to perform lawn care maintenance as an independent contractor. During this time, Mr. Work used Roundup® exclusively. Mr. Work applied said Roundup® using a variety of different sprayers, including but not limited to one (1), three (3), and five (5) gallon "back-pack"

[31] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen"*, Newsweek, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[32] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[33] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[34] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

mist sprayers, and while working for Chem Lawn Mr. Work utilized a spray truck. Mr. Work applied Roundup® according to the manufacturer's specifications while following proper safety protocols.

102.

Plaintiff was diagnosed with NHL in November, 2014. His continued exposure to Roundup® caused him to undergo six (6) months of chemotherapy treatments as well as continued PET and/or CT scans every three (3) months.

**CLAIM ONE**
**PRODUCTS LIABILITY**
**(DESIGN DEFECT AND INADEQUATE WARNING)**
**(Against Defendant Monsanto)**

103.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

104.

Plaintiff brings this products liability claim against Defendant under the Louisiana Products Liability Act.

105.

Defendant, Monsanto designed, manufactured, produced, marketed, and sold the Roundup® products to Plaintiff Mr. Work at a substantial profit.

106.

The Roundup® products used by Plaintiff were defective in design, manufacture, construction, and with regard to warnings, labeling, and warranties both express and implied. As a consequence of those defects, the Roundup® products were defective, per se. Defendant is strictly liable for all damages caused by its defective products pursuant to the Louisiana Product Liability Act (LPLA) and Article 2315 et seq. of the Louisiana Civil Code.

107.

Defendant has knowledge of the defects in the Roundup® they sold to Plaintiff and failed to advise Plaintiff of those defects. The defects existed at the time of the manufacture and at the time it was delivered to Plaintiff. If Plaintiff had known that Roundup® by virtue of its defects would cause him to develop NHL, or if Plaintiff had known the Roundup® was defective and unreasonably dangerous for its intended use, Plaintiff would not have purchased it. As

manufacturers of the defective product, Defendant Monsanto is presumed to have known of the defect(s) prior to the sale. The Defendant is deemed to be a bad faith seller in accordance with La. C.C. Article 2545. Plaintiff is entitled to judgment against Defendant for the return of the purchase price of the Roundup®; all hospital, surgical, and medical costs related to the NHL; and all other economic losses occasioned by the sale. Plaintiff is further entitled to an award of damages and attorney's fees from Defendant Monsanto.

108.

Defendant Monsanto is strictly liable for all Plaintiff's damages and for the cost of medical monitoring under the LPLA and Civil Code Article 2315 et seq. The Roundup® used by Plaintiff was defective in design, manufacture, composition or construction and with regard to labeling, warnings, and warranties both express and implied. Monsanto breached the express and implied warranties they conveyed concerning the safety, superiority, and durability of its product.

109.

Because the defective Roundup® purchased by Plaintiff has been proven to cause cancers and other serious conditions, Plaintiff has required medical evaluation and monitoring and will continue to require monitoring and evaluation indefinitely.

110.

Plaintiff's prolonged exposure to Roundup® poses a future health risk and requires medical evaluation and monitoring.

111.

Defendant could have employed safer alternative designs and formulations.

112.

At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

113.

Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

114.

The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.   Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.  Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

115.

At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

116.

Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products and of those exposed to these products, including Plaintiff.

117.

Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

118.

The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

119.

Defendant's conduct, as described above, was reckless.  Defendant risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and Defendant suppressed this knowledge from the general public.  Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public.

120.

As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

121.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**CLAIM TWO**
**STRICT LIABILITY (FAILURE TO WARN)**
**(Defendant Monsanto)**

122.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

123.

Plaintiff brings this strict liability claim against Defendant for failure to warn.

124.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

125.

Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff. Defendant therefore had a duty to warn of the

risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

126.

At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

127.

At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

128.

At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

129.

Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

130.

Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and

Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

131.

At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

132.

Plaintiff was exposed to Defendant's Roundup® products in the course of his employment as a lawn care professional, as described herein, without knowledge of their dangerous characteristics.

133.

At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

134.

Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

135.

Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

136.

The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers and/or

horticultural workers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

137.

To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

138.

As a result of its inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

139.

Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

140.

The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained his injuries.

141.

Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries.

142.

As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

143.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**CLAIM THREE**
**NEGLIGENCE**
**(Against Defendant Monsanto)**

144.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

145.

Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

146.

At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

147.

At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings

concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

148.

At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

149.

Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

150.

Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

151.

As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

152.

Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

153.

Defendant's negligence included:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

g.   Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.   Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

i.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.   Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

k.   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.   Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

154.

Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

155.

Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

156.

Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

157.

Defendant's conduct, as described above, was reckless.  Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.  Defendant's reckless conduct therefore warrants an award of punitive damages.

158.

As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries.  Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

159.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

**CLAIM FOUR**
**CIVIL CONSPIRACY**
**INTENTIONAL MISREPRESENTATION AND NONDISCLOSURE**
**(All Defendants)**

160.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein:

161.

Defendants engaged in a civil conspiracy beginning no later than the mid to late 2000's to make fraudulent representations to the public that glyphosate was not carcinogenic and was safe to use without any health side-effects to those exposed to glyphosate. Defendants conspired to make these representations through advertisements, labeling, published studies, marketing campaigns, and press releases.

162.

Defendants further conspired to fraudulently and intentionally conceal facts related to the safety of glyphosate, including the fact that it causes NHL.

163.

Ragan & Massey and Monsanto along with numerous other glyphosate distributors and producers have acted as in league with one another, using corporate financed research to perpetuate a conspiracy against the citizens of Louisiana, as well as the rest of the United States, including Mr. Work.

164.

On October 20, 2015, Ragan & Massey, along with Monsanto, through the JGTF, submitted a letter to the California Office of Environmental Health Hazard Assessment, whereby they cited their own fraudulent research to attempt to dissuade the State of California from reclassifying Glyphosate.

165.

On numerous occasions the JGTF has acted in a manner designed to deceive the public, governmental agencies, along with any and all entities that sought to tell the truth relative to the dangers inherent in exposure to glyphosate.

166.

On July 30, 2015, the JGTF issued a press release wherein they called into question the validity of the study which lead to the IARC's classifying glyphosate as a "probable carcinogen."

167.

The representations and concealments were made in order to convince the public to continue using glyphosate so that the Defendants could profit from its sale. These representations and concealments were further made in order to prevent governments from revoking the Defendants' license to sell glyphosate and to prevent governments from adding a warning to the labeling which would reduce sales of glyphosate.

168.

Plaintiff justifiably relied on the representations and concealments of Defendants in using glyphosate himself. If he had been told that glyphosate was carcinogenic then Plaintiff would not have used glyphosate. Plaintiff was exposed to Defendants' marketing efforts, commercials and would have learned of the danger of glyphosate if Defendants' had not fraudulently concealed such facts.

169.

As a result of Defendants' conspiracy to fraudulently misrepresent and conceal facts related to the safety of glyphosate, Mr. Work developed NHL and was diagnosed in 2014.

170.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**CLAIM FIVE**
**BREACH OF EXPRESS WARRANTY**
**(Against Monsanto)**

171.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein:

172.

Defendant expressly represented to Plaintiff and other consumers and the medical community that Roundup® was safe and fit for its intended purposes, that is was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested.

173.

Roundup® does not conform to Defendant's express representations because it is not safe, has numerous and serious side effects, and causes severe and permanent injuries.

174.

At all relevant times Roundup® did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

175.

Plaintiff and other consumers relied upon Defendant's express warranties.

176.

As a direct and proximate result of the Defendant's breach of express warranty, the Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and have undergone extensive medical and surgical procedures. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and have suffered a loss of earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally, and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual damages from the Defendants as alleged herein.

177.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CLAIM SIX**
**BREACH OF IMPLIED WARRANTY**
**(Against Defendant Monsanto)**

178.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein:

179.

The Defendants marketed, distributed, supplied and sold the subject product as a "safe," general-purpose herbicide for widespread commercial and consumer use.

180.

At the time that the Defendant marketed, distributed, supplied, and sold Roundup®, they knew of the use for which the subject product was intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

181.

The Plaintiff, reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.

182.

The Plaintiff purchased and used the subject product for its intended purpose.

183.

Due to Defendant's wrongful conduct as alleged herein, the Plaintiff could not have known about the nature of the risks and side effects associated with the subject product until after use.

184.

Contrary to the implied warranty for the subject product, Roundup® was not of merchantable quality, and was not safe or fit for its intended uses and purposes as alleged herein.

185.

As a direct and proximate result of the Defendant's breach of implied warranty, the Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and have undergone extensive medical procedures. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. The Plaintiff has lost past earnings and have suffered a loss of earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual damages from the Defendant as alleged herein.

186.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for judgment against Defendants as follows:

(1) Judgment for Plaintiff and against Defendants;

(2) Damages in the form of compensatory damages in excess of the jurisdictional limits, trebled on all applicable counts;

(3) Physical pain and suffering of the Plaintiff;

(4) Pre and post judgment interest at the lawful rate;

(5) Reasonable attorneys' fees and costs and expert fees;

(6) A trial by jury on all issues of the case;

(7) For any other relief as this court may deem equitable and just;

(8) Restitution of all purchase costs that Plaintiff paid for Roundup®, disgorgement of Defendants' profits, and such other relief as provided by law;

(9) Costs of suit; and

(10) Such other relief this Court deems just and proper.

Respectfully submitted,

By: ______________________

HUNTER W. LUNDY (#8938)
MATTHEW E. LUNDY (#19988)
RUDIE R. SOILEAU, JR. (#2119)
KRISTIE M, HIGHTOWER (#31782)
MAX E. GUTHRIE (#32487)
**LUNDY, LUNDY, SOILEAU & SOUTH, LLP**
501 Broad Street (70601)
P. O. Box 3010
Lake Charles, LA 70602-3010
Telephone: (337) 439-0707
Facsimile: (337) 439-1029

Robin L. Greenwald (*pro hac vice* application forthcoming)
Maja Lukic (*pro hac vice* application forthcoming)
Christopher B. Dalbey (*pro hac vice* application forthcoming)
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
Fax: (212) 344-5461
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Tel: (310) 247-0921
Fax: (310) 786-9927

BRAD A. STEVENS (#30076)
KATHRYN J. EDWARDS (#33813)
**EDWARDS & STEVENS LAW FIRM**
102 N. Myrtle Street
P.O. Box 974
Amite, Louisiana 70422
Telephone: (985) 747-1088
Facsimile: (985) 747-1086

J. E. Cullens, Jr., T.A. (#23011)
**WALTERS, PAPILLION,THOMAS, CULLENS, LLC**
12345 Perkins Road, Bldg One
Baton Rouge, LA 70810
Phone: (225) 236-3636
Facsimile: (225) 236-3650

*Attorneys for Plaintiff,*
*JAMES M. WORK*

**PLEASE SERVE:**

RAGAN AND MASSEY, INC.
*Through its registered agent*
Thomas A. Ragan
1011 North General Pershing Street
Hammond, LA 70401

MONSANTO COMPANY
*Through its registered agent*
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802

PLEASE SERVE VIA LOUISIANA LONG ARM STATUTE

JOINT GLYPHOSATE TASK FORCE, LLC
*Through its registered agent*
CORPORATION SERVICE COMPANY
2711 CENTERVILLE RD SUITE 400
WILMINGTON, DE 19808

STATE OF LOUISIANA AMITE, LOUISIANA
PARISH OF TANGIPAHOA APR 22 2016
DATE
I s/HEATHER MUSE do hereby certify that this document is a true and correct copy of the original thereof, consisting of 39 page(s) being a reproduction thereof from the records on file with the undersigned, in accordance with Louisiana Revised Statutes, Title 13, Section 3733.
DEPUTY CLERK





CERTIFIED MAIL™

7014 0150 0001 8036 8118

UNITED STATES POSTAGE
PITNEY BOWES
02 1M
0004280607
$ 08.83⁰
APR 28 2016
MAILED FROM ZIP CODE 70601

UNITED STATES POSTAGE
PITNEY BOWES
02 1M
0004280607
$ 00.21⁰
APR 28 2016
MAILED FROM ZIP CODE 70601

LUNDY, LUNDY, SOILEAU & SOUTH, L.L.P.
ATTORNEYS AT LAW
P.O. Box 3010
LAKE CHARLES, LA 70602-3010

File No. 6117

Joint Glyphosate Task Force, LLC
Through its Registered Agent,
CORPORATION SERVICE COMPANY
2711 Centerville Road, Suite 400
Wilmington, DE 19808

4234302